**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------

Rodney McMillan,                                    ]
                                                    ]   **10 CV 4806 (JSR)**
                             **Plaintiff**,          ]
                                                    ]
                    **- against -**                 ]
                                                    ]
**City of New York**,                               ]
                                                    ]
                             **Defendant**,          ]
-------------------------------------------------------------------

# Plaintiff's Memorandum of Law In Opposition To Defendant's Motion For Summary Judgment

MICHAEL G. O'NEILL
(MO3957)
Attorney for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990

Of Counsel:

Michael G. O'Neill

# Table of Contents

Table of Contents ................................................................................................................2

Authorities Cited ...............................................................................................................3

Preliminary Statement .......................................................................................................5

Statement of Facts .............................................................................................................5

Applicable Law ................................................................................................................15
    Standard of Review ....................................................................................................15

Argument .........................................................................................................................15
    I.   Plaintiff is Not Pursuing Time Barred Claims.......................................................16
    II.   Plaintiff has stated a prima facie case for disability discrimination.......................16
        a.   Plaintiff Is Qualified For His Position ........................................................17
        b.   Plaintiff Was Disciplined "Because Of" His Disability. .............................19
    III.   Plaintiff Need Not Demonstrate Pretext. ..............................................................21
    IV.   Defendant Discriminated Against Plaintiff By Failing To Provide
        Reasonable Accommodations. ...............................................................................23
        Plaintiff's Request For A Reduced Case Load Has Not Been Granted..............24
        Plaintiff's Request For Voice Activated Software Has Not Been
        Granted.................................................................................................................25
        Plaintiff's Request For A Personal Printer Was Untimely Granted. .................27
        Defendant's Refusal to Grant Plaintiff A Later Start Time Is
        Unreasonable........................................................................................................27

Conclusion .......................................................................................................................31

# Authorities Cited

## Cases

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir. 1995)......................................19, 21

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) ....................................................23

*Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281 (S.D.N.Y. 2005) ............................18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ............................................15

*Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636 (S.D.N.Y. 1998)............................16

*Donahue v. Windsor Locks Brotherhood. of Fire Commissioners*, 834 F.2d 54 (2d Cir. 1987)

...................................................................................................................................................15

*Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219 (2d Cir. 1994) ..........15

*Giordano v. City of New York*, 274 F.3d 740 (2d Cir. 2001).....................................................19

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000) .......................................................18

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) .......................................................................18

*Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003).....................................................16

*McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92 (2d Cir. 2009) ...................28

*McEniry v. Landi*, 84 N.Y.2d 554 (1994) ...............................................................................20

*Morris v. City of New York*, 153 F. Supp. 2d 494 (S.D.N.Y. 2001) ........................................20

*Owens v. New York City Housing Authority*, 934 F.2d 405 (2d Cir.1991)..............................18

*Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209 (E.D.N.Y. 2007) ....................18

*See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006) ............................................18

*Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161 (2d Cir. 2006) .....................................................18

*Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997) .....................................................23

*Weiss v. JPMorgan Chase & Co.*, 06 CIV. 4402 (DLC), 2010 WL 114248 (S.D.N.Y. Jan. 13, 2010) ..........................................................................................................................................20

*Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376 (2d Cir.2001) ............................16

## Preliminary Statement

Plaintiff is a severely physically and mentally disabled person.  He was born without a left arm.  He also suffers from schizophrenia, which is controlled by medication.  Although either disability would itself significantly limit a person's ability to work and live independently, plaintiff has obtained a masters degree and has been gainfully employed as a case manager for the City of New York Human Resources Administration for nearly 25 years.  This lawsuit arises from the City's refusal to provide reasonable accommodations to plaintiff and the City's punitive actions toward plaintiff based on the limitations posed by his disabilities.[1]

## Statement of Facts

Plaintiff is a 52 year old man who was born without a left arm and who suffers from schizophrenia.  Plaintiff Dep. 23:20, 45:15-19, 52:11-13.[2]  Despite these daunting disabilities, plaintiff earned undergraduate and postgraduate degrees from Marshall University and has been gainfully employed for most of his adult life.  Plaintiff Dep. 25:10-25.  In December 1987, plaintiff was appointed to the position of Case Manager at the New York City Human Resources Administration ("HRA").  Plaintiff Dep. 30:1-2, 31:4-10.

In 1997, plaintiff was assigned to work as a case manager for HRA's Community Alternative Systems Agency ("CASA") administering home care services to elderly and disabled clients.  Plaintiff Dep. 34:3-10, 100:24-101:5.  Plaintiff's job duties include going out in the field for annual home visits, processing a social assessment, recertifying clients'

---

[1]       This is not the first lawsuit plaintiff has filed against HRA.  In its motion, defendant brings up history of past litigation, which is irrelevant and defendant makes no legal arguments based on that litigation.  The previous lawsuits were all dismissed on procedural grounds, and it has never been held that plaintiff was not discriminated against by defendant.

[2]       Excerpts from plaintiff's deposition are attached as Exhibit A to the declaration of Michael G. O'Neill.

Medicaid eligibility, making referrals to other social service agencies, and addressing client concerns. Thornton Dep. 10:24-12.[3]  Case managers are responsible for scheduling and coordinating their own client meetings, and use a variety of forms to memorialize their client interactions including the W25 history sheet and the M11S social assessment form.  Thornton Dep. 18:23, 22:10.

Since much of plaintiff's work is processed through his personal computer, at various times during his employment at CASA[4], plaintiff has requested voice operated software, which would help compensate for his slower typing times.  Plaintiff Dep. 17:4-13.  In 2003 or 2004, defendant installed a software program called Dragon Naturally Speaking on plaintiff's computer.  Plaintiff Dep. 17:4-13.  This software can permit the user to perform all computer functions by giving verbal instructions through a microphone attached to the computer.  O'Neill Dec. ¶¶ 17-22.  The manufacturer includes a headset (which contains a microphone) with the software, but the headset was not provided to plaintiff, rendering the software useless.  Plaintiff Dep. 15:21-32.

Between 2004 and 2010, plaintiff made numerous inquires to his supervisor regarding the availability of a replacement headset, but plaintiff's requests were either ignored or denied.  Plaintiff Dep. 15:21-32.

In his August 21, 2008 charge of discrimination filed with the EEOC, plaintiff stated that "I was promised voice activated equipment to assist me in my job, however I never received the device."  O'Connor Dec. Ex. P.  In his March 23, 2010 "Request for a

---

[3]    Excerpts from Loshun Thornton's depositions are attached as Exhibit B to the declaration of Michael G. O'Neill.

[4]    Prior to transferring into CASA V, plaintiff had received accommodations from other HRA departments to assist with typing, a task that is difficult for plaintiff because he has only one arm.  At one point, HRA had assigned a personal typist to type all his work.  Plaintiff Dep. 33:10-20.

Reasonable Accommodation" submitted to defendant, plaintiff requested "voice activated equipment to do my work." O'Connor Dec. Ex. D.

Following plaintiff's March 23, 2010 Request for a Reasonable Accommodation, defendant did provide plaintiff with a headset, however the voice activated system remains non-functional. Plaintiff Dep. 116:18-121:9-21. According to plaintiff, when he speaks into the headset's microphone, "it does nothing." Plaintiff Dep. 12:9-15. Plaintiff has never been trained in the use of that software. Plaintiff Dep. 116-120.

Plaintiff's March 23, 2010 Request for a Reasonable Accommodation states that "[I am requesting] a printer to go with my specialized computer that I have had for many years." O'Connor Dec. Ex. D. Plaintiff had had a printer on his desk for about ten years. Plaintiff Dep. 124:3-5. In late 2009, the printer stopped working. Plaintiff Dep. 124:1-2. In addition, toner was spilling from the printer, creating a mess and a potential health hazard on plaintiff's desk. Plaintiff Dep. 125:9-21, 153:2-4. Plaintiff requested that the broken printer be removed and replaced with a functioning printer. *Id.* Both these requests went ignored until this lawsuit was filed. Plaintiff Dep. 125:22-24. On December 13, 2010, following plaintiff's deposition and the deposition of plaintiff's supervisor Loshun Thornton, a new printer was installed on plaintiff's desk. O'Connor Dec. Ex. J. Defendant has not explained why plaintiff was required to file a federal lawsuit to have his request concerning a printer taken seriously.

Plaintiff's schizophrenia is treated by medication. Plaintiff Dep. 52:16-17. These medications interfere with plaintiff's natural sleep cycle, and plaintiff is required to take additional medications to go to sleep at night and to help him wake up in the morning. Plaintiff Dep. 63:12-64:8. As a result, plaintiff has a very hard time arriving at work at the same time on a consistent basis, and he has a very hard time arriving at work by 10:15 a.m.

every morning, which is the latest that he can arrive without being considered late.  Plaintiff Dep. 66:6 – 68:23.

 As a consequence, plaintiff has, and has had during the relevant time frame, a serious tardiness problem.  Defendant does not dispute that plaintiff's difficulty arriving at work is caused by his disability.[5]  Lemons Dep. 145:7- 147:5.  Nevertheless, defendant has steadfastly refused to provide any type of accommodation whatsoever to plaintiff with respect to his lateness.  Lemons Dep. 73:18 – 75:4.

At plaintiff's workplace, a lateness can be approved or disapproved.  Vinson Dep. 43:22-44:25.[6]  When a lateness is approved, an employee may apply accumulated annual leave or sick leave or other banked leave to the lateness and be paid for that time.  Vinson Dep. 43:22-44:25.  Alternatively, if the employee has no banked time, or simply does not want to use banked time, the lateness will be unpaid.  Vinson 65:16-66:13.  In addition, an approved lateness (whether paid or not) will not be the basis for any disciplinary action against the employee.  Vinson Dep. 117:19-118:14.  In contrast, a lateness that is not approved is always unpaid and can result in disciplinary action against the employee.  *Id*.

Up until 2008, plaintiff's latenesses were approved by his supervisor.  Plaintiff Dep. 144-148.  At some point in about 2008, however, plaintiff's supervisor's supervisor decided that, from that point on, all of plaintiff's instances of lateness would be disapproved.  Thornton Dep. 149:11-19.  This meant that plaintiff would no longer be able to apply banked leave time to his latenesses, and it also exposed him to disciplinary action. Vinson Dep. 117:19-118:134.

---

[5]     Plaintiff's psychiatrist has explained to defendant why plaintiff's attendance problem cannot be solved by changing his medications.  See O'Neill Dec. Ex. F, H.

[6]     Excerpts from Daphne Vinson's deposition are attached as Exhibit C to the declaration of Michael G. O'Neill.

In order to avoid being disciplined for lateness, plaintiff requested a later start time.[7] Although it is undisputed that plaintiff requested a later start time, the first written request for this accommodation was not made until plaintiff submitted his "Request for a Reasonable Accommodation" on March 23, 2010.  O'Connor Dec. Ex. D.  The record is clear, however, that in 2008, plaintiff verbally requested such an accommodation and that, even in the absence of a formal request, defendant perceived of plaintiff's need for the accommodation.  Plaintiff Dep. 96:17-98:4, McMillan Dec. ¶ 4.[8]  In support of these verbal requests, plaintiff provided his supervisors with letters from his treating psychiatrist describing the extent of the disability and the need for an accommodation.  O'Neill Dec. Ex. F, H, Thornton Dep. 203-205.

According to plaintiff, he would periodically ask his immediate supervisor, Thornton, for a later starting time. McMillan Dec. ¶4.  Thornton would tell plaintiff that he would have to ask somebody else about that. McMillan Dec. ¶4.

Defendant's "Disability Discrimination Complaint and Reasonable Accommodation Policy" provides in pertinent part that:

> Qualified employees with disabilities seeking reasonable accommodations to perform essential job functions should advise their supervisor of their need for accommodation.  The supervisor must record an employee's request on a Reasonable Accommodation Request form W-766C. Forms and related general instructions can be obtained from the EEO Office or from the EEO link in the OSR homepage. Within 10 business days of receiving the employee's request, the supervisor or manager must grant or deny the request, so documenting the decision on the W-766C form.

O'Neill Dec. Ex. E.

---

[7]   Defendant does not have fixed start times.  Employees are given a window of one hour to arrive at work.  This is referred to as "flex time."  Under this flex time system, an employee with a 9-10 window can arrive at work at any time within that hour and leave eight hours after arriving.  When plaintiff refers to requesting a later start time, he means a later end time to his flex time window.  Thornton Dep. 116-121.
[8]   The declaration of Rodney McMillan is attached to the declaration of Michael G. O'Neill as Exhibit L.

There is no evidence that Thornton ever followed this procedure.  It is undisputed, however, that both Thornton and Thornton's supervisor, Jean Belthrop, were aware that plaintiff's late arrival was caused by the medications taken by plaintiff to treat his disability.  Thornton Dep. 170-173.  Belthrop and Thornton held a "supervisory conference" with plaintiff on June 9, 2008.  *Id*.  Belthrop "memorialized" that conference in a November 5, 2008 memorandum.[9] *Id.*  According to Belthrop's memorandum:

> We discussed your continued lateness and the impact the lateness has on your job performance.  You stated the reason for the lateness was the effect of the medication you were taking and your inability to travel.  I asked if it was possible to take the medication at a later time, you stated the medication had to be taken as prescribed by your physician.  I asked if it was possible to talk to your physician about the side effects and if the time of taking your medication can be changed so you would be able to travel in the morning.  You stated you would discuss the matter with your physician.

> O'Neill Dec. Ex. G.

Plaintiff did discuss the matter with his physician, who wrote a letter dated October 1, 2008 concerning the issue.  In his letter, Dr. Berc wrote:

> I am a psychiatrist who has treated Mr. McMillan since 1996 for his illness of Schizophrenia. He has been diligent about compliance with treatment. His medication treatment has been stabilized over many years of effort. Unless there is a very major change in his biology, that treatment should not be altered (FYI he claims he was told to change his medication by employer so as to be able to arrive at work on time. This advice, if true was ill founded and dangerous.)

> *        *        *

> At the current time, Mr. McMillan states he could arrive at work by l0 AM and needs such accommodation.[10]  This is credible and medically

---

[9]       Defendant has not explained why Belthrop waited five months to document the meeting. Thornton Dep. 172:7-20.

[10]      Plaintiff testified that this should have read 11:00 am and that he requested Dr. Berc to revise the letter. Plaintiff Dep., pp. 76-77.

necessary.  I have had identical discussions with various employer-
representatives, legal advisors, etc., in the past.  I can assure you that Mr.
McMillan is not manipulating his illness for personal gain or unfair treatment.
Rather, for many years he has desperately tried to remain a functioning
member of the workforce to the best of his capacity.

O'Neill Dec. Ex. F.

Dr. Berc followed up with another letter dated December 20, 2008:

I am writing after having been shown a file by Mr. McMillan.  This file
seems to document some recent lateness and absentee charges.  One document
states that Mr. McMillan was supposed to speak with his doctor (presumably
me) about change of medication to facilitate prompt work arrival.  I believe, in
November, I responded to a comment made by Mr. McMillan that he believed
he was told it was his responsibility to change his medication to facilitate work
availability. Again, I reiterate, over many years many changes have been made
to Mr. McMillan's medication. The goal has. been to help him maintain his
ability to function socially.  No other medical changes are appropriate at this
time.

O'Neill Dec. Ex. H.

Although plaintiff testified that he submitted Dr. Berc's letter to defendant, there is no

evidence that either of plaintiff's supervisors followed the directives of defendant's

"Disability Discrimination Complaint and Reasonable Accommodation Policy," much less

engaged in anything remotely resembling an interactive process.  Plaintiff Dep. 75:13-15;

Thornton Dep. 203-205.  Rather, defendant proceeded to discipline plaintiff for his latenesses

caused by his disability.  Thornton Dep. 192:3-193:9, O'Neill Dec. Ex. I, K.

On May 8, 2009, plaintiff was fined 8 days pay as a result of charges that had been

brought against him.  O'Neill Dec. Ex. I.

11

On December 8, 2009, Belthrop forwarded a memo concerning plaintiff's excessive lateness to the Denise Heyward, the Director of CASA V (plaintiff's work unit) for disciplinary action.  O'Neill Dec. Ex. K.

In April, 2010, Charges and Specifications of "Misconduct and/or Incompetence" were brought against plaintiff.  Following an informal conference on April 22, 2010, Michael Fitzpatrick, defendant's "Informal Conference Holder" recommended that plaintiff's employment be terminated.  O'Connor Dec. Ex. L, M, N.  Eventually, plaintiff was suspended without pay for 30 days as a result of these charges. O'Connor Dec. Ex. O.

On March 23, 2010 and on April 22, 2010, plaintiff submitted formal requests for reasonable accommodations which included a later flex starting time.  O'Connor Dec. Ex. D, K.  These requests were forwarded to Donald Lemons, defendant's Deputy Director of Equal Employment Opportunity.  Lemons Dep. 43-45.[11]  Lemons, who never met with plaintiff, spoke with plaintiff's supervisor and determined that plaintiff's request for an accommodation could not be granted because there would be no supervision for plaintiff after 6 pm.  Lemons Dep. 43:19-21, 68.  Lemons did not explore any other possible solutions to plaintiff's request. Lemons Dep. 73-75.  Indeed, Lemons did not engage in an interactive process with plaintiff and did nothing to ascertain the underlying reasons for plaintiff's request or any other possible solutions.  *Id*.  When Lemons told plaintiff that there was no supervision after six o'clock, plaintiff acknowledged Lemons by replying "okay."  Lemons Dep. 73:18-74:22.  Lemons interpreted this to mean that plaintiff "was fine with that."  *Id*.

---

[11]     Excerpts from Donald Lemons's depositions are attached as Exhibit D to the declaration of Michael G. O'Neill.

Lemons was grossly misinformed about plaintiff's work environment.  Lemons testified that plaintiff's location closed at 6:15 p.m.  Lemons Dep. 76:7-78:2.  In fact, plaintiff's building is open until much later, at least 10:00 p.m., and nothing prevents plaintiff from working past 6 p.m. McMillan Dec., ¶5.  Plaintiff himself has worked past 7:00 p.m. on many occasions. McMillan Dec., ¶5, O'Neill Dec. ¶ 23-28, O'Connor Dec. Ex. R.  According to plaintiff, nothing prevents him from working past 6:00 p.m.  McMillan Dec., ¶5.

Discovery has revealed that there are other ways to accommodate plaintiff's needs.  First and foremost, if defendant were to approve plaintiff's lateness, it would prevent him from being exposed to disciplinary action and its attendant financial penalties and possible loss of employment.  Thornton Dep. 192:3-193:9.  Even though defendant acknowledges that plaintiff's lateness is caused by his disability, it has failed to explain why it has refused to approve his latenesses or what hardship it would pose to the defendant to do so.  Thornton Dep. 134:10-135:10, Lemons Dep. 69-75.

In addition to approving plaintiff's latenesses, plaintiff could bank "comp time."  Vinson Dep. 45-46.  When an employee works more than 7 hours he or she can elect to accumulate the overtime to be used at some later date as paid vacation or leave time.  *Id*.  Plaintiff could also shorten his lunch hour or even work through lunch.  Vinson Dep. 53-56.  These other ways to accommodate plaintiff were never explored with plaintiff, because defendant never engaged in an interactive process with plaintiff.[12]  Lemons Dep. 78:11-79:14.

As for plaintiff's original request to extend his flex starting time, the record is silent as to defendant's reason for denying that accommodation to plaintiff.  To be sure, defendant's

---

[12]     Strictly speaking, these are not accommodations, because they are available to any employee under defendant's existing policies.  A true accommodation is an exception to a policy or procedure.

witnesses all testified that it was not possible because there was no supervision available after 6 p.m., but that "explanation" is a non explanation.  See Lemons Dep. 73:18-74:22.  An accommodation is a request for an exception to the employer's general work rules and procedures, and therefore simply citing the existence of a workplace rule merely begs the question.  Lemons seemed to think the requirement of a supervisor's presence was grounded in a union contract, but that contract has never been produced, and the source of Lemons' belief has never been revealed.  Lemons Dep. 69-75, 161-164:4.  Given Lemons' serious misinformation with respect to the operation of plaintiff's building, his belief as to the requirements of a union contract are entitled to no weight.

In 2009, plaintiff approached the Ms. Hayward, the director of CASA V, with a copy of his EEOC complaint of August 21, 2008, which included the request for voice activated software and a later start time.  Plaintiff Dep. 43:24-45:11, O'Connor Dec. Ex. P.  Although the EEOC complaint did not specifically request a reduced caseload as an accommodation for plaintiff's disabilities, he believes that after he showed Ms. Hayward the complaint his caseload became somewhat lighter.  Plaintiff Dep. 43:24-45:11.  Plaintiff, however, was never explicitly informed that this request for accommodation had been granted.  Plaintiff Dep. 45:5-6.  Plaintiff believes that he can handle a case load of between 80-90 cases at any given time, but there have been occasions where he has close to 200 cases assigned to him at once.  Plaintiff Dep. 127:17-128:11.

A June 15, 2010 memorandum from the EEO office signed by Lemons' supervisor, Stephanie Grant, states that the director of CASA V informed the EEO office that plaintiff had a reduced caseload.  O'Connor Dec. Ex. S.  This memo, however, is contradicted by a

December 9, 2009 memorandum from Belthrop which stated that the changes in plaintiff's caseload are due to normal fluctuations in the workload.  O'Neill Dec. Ex. J.

Plaintiff's current caseload is about 200 cases.  McMillan Dec. ¶ 3.

# Applicable Law

### Standard of Review.

The rules governing summary judgment are well known, and only a brief overview is necessary.  Such relief may be granted only when the movant carries its burden of demonstrating there are not any genuine issues of material fact for trial, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986).  No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor. See *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994).

 In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., *Donahue v. Windsor Locks Brotherhood. of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987).  Such genuine disputes of material fact exist for each of the claims raised by plaintiff in his pleadings. Defendants motion should be denied.

# Argument

## I.      Plaintiff is Not Pursuing Time Barred Claims.

Defendant's first enumerated argument notes that any claims arising more than 300 days before the filing of the EEOC charge are barred by the statute of limitations.  Plaintiff is not pursuing any claims that arose before that date, however, and thus it is unnecessary to respond to this argument.[13]

## II.      Plaintiff has stated a prima facie case for disability discrimination.

The purpose of the prima facie case is simply to "pry an explanation" out of the defendant for the reason for the adverse employment action in question.  *Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998).  The plaintiff's burden at the prima facie stage is *de minimis.  Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  "The prima facie burden is low because all the prima facie showing does is force defendant to offer an explanation."  *Cully, supra*.  It is not supposed to be difficult.  *Mandell v. County of Suffolk*, 316 F.3d 368, 378 (2d Cir. 2003).

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability.  *Giordano v. City of New York*, 274 F.3d 740, 747 (2nd Cir. 2001). To make out a prima facie case under the ADA, the plaintiff must demonstrate that the employer was covered under the Act, that the plaintiff was disabled within the meaning of the ADA, that he was qualified to do the essential functions of the position with or without reasonable accommodation, and that he suffered an adverse employment action on account of his disability.  *Id., citing Heyman v. Queens Village*, 198 F.3d 68, 72 (2d Cir. 1999).

---

[13]      Defendant asserts that plaintiff's request for a headset to accompany the voice activated equipment installed on his computer in or about 2003 a time barred claim.  Plaintiff, however, is not seeking any relief based on defendant's failure to provide the headset.  Defendant finally provided a headset in about 2009, but failed to install the software properly (it does not function) or train plaintiff in its use.

Defendants do not challenge that they are covered by the ADA, or that plaintiff's physical and mental limitations constitute disabilities within the meaning of the ADA. They contend, however, that that he was not qualified to do the essential functions of the position with or without reasonable accommodation, and that he did not suffer an adverse employment action because of his disability. Defendants further contend that it articulated a legitimate business reason for the adverse employment action against plaintiff. Each point will be addressed in turn.

### a. Plaintiff Is Qualified For His Position

Defendant's argument – that plaintiff cannot establish the "qualified" prong of the *McDonnell Douglas* prima facie case – borders on the frivolous. Not only is plaintiff currently employed by defendant, but plaintiff holds a civil service position. Plaintiff Dep. 30-31. Plaintiff took and passed the civil service exam required for that position, and he was appointed to the position off the civil service list in 1987. *Id*. Plaintiff has remained employed by defendant in that position for at least 23 years. Plaintiff Dep. 30:1-2, 31:4-10. To suggest that plaintiff is somehow "unqualified" for the position is absolutely spurious.

Defendant conflates "qualification" with "performance." Whether this confusion was intentional or not, defendant should know better, because the law in this regard has been settled for many years.

> In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified. Moreover, when, as in this case, the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened. An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-

17

discriminatory reason for the employer's adverse action. But the crucial point remains the same: the qualification prong, as to which the initial burden lies on plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue.

*Gregory v. Daly*, 243 F.3d 687, 696-97 (2d Cir. 2001).  *See also Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161 (2d Cir. 2006); *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 288-89 (S.D.N.Y. 2005).

It is true that there is a line of cases that suggests that excessive absences render an employee "unqualified" for purposes of the prima facie case.  *See Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 221 (E.D.N.Y. 2007) and cases cited therein.  These cases are distinguishable from the instant case, however, because they deal with absences from work and not lateness.

Just as importantly, the Second Circuit has never endorsed the line of cases relied on by defendant, and plaintiff submits that it is unlikely to do so.  The Second Circuit has made it clear that issues relating to job performance are properly considered after the prima facie case has been made.  No matter how egregious the performance issue, the prima facie case looks only at the "basic skills necessary for the performance of the job."  *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir.1991).  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172 (2d Cir. 2006)(threats of violence did not render employee unqualified for prima facie purposes.)

The Second Circuit's strict approach to the issue is the more logical.  The prima facie case considers only plaintiff's evidence. *Graham v. Long Island R.R.*, 230 F.3d 34, 42 (2d Cir. 2000)("Accordingly, we think only [plaintiff's] evidence should be considered when deciding whether plaintiff has met his initial burden.")  Furthermore, the ADA defines reasonable

accommodations as including but not limited to "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position...." 42 U.S.C. § 12111(9)(B). Plainly, Congress contemplated that a reasonable accommodation could include modification of working hours, and a bright line rule of the type suggested by defendant (i.e., that attendance issues automatically rendered an employee unqualified) would run afoul of the express language of the Act.

### b. Plaintiff Was Disciplined "Because Of" His Disability.

Defendant's contention that plaintiff cannot show that the adverse employment actions taken against him were "because of" his disability is only slightly less substantial than its "not qualified" argument.[14] Plaintiff's pay was docked and eventually plaintiff was suspended for 30 days without pay because of his repeated instances of lateness. Plaintiff Dep. 133:23-134:13, O'Connor Dec. Ex. O. These actions unquestionably constitute adverse employment actions, and they were unquestionably "because of" plaintiff's disability, because plaintiff's disability caused the instances of lateness underlying the disciplines in question. The holding from *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995), is right on point here:

> Failure to consider the possibility of reasonable accommodation for such disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities. Ms. Borkowski introduced evidence, in the form of letters from a physician and a psychologist, suggesting that the inadequacies in her performance were due entirely to her disabilities. Under the circumstances, this evidence was

---

[14] In its memorandum, defendant argues that the adverse employment action did not take place "under circumstances giving rise to an inference of discrimination." Def. Mem., p. 8. This articulation of the fourth prong of prima facie case is typically used in cases involving animus or motivation. In disability cases, the courts more frequently state the fourth prong as plaintiff suffering an adverse employment action "because of" his or her disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001). Plaintiff need not show that defendant was motivated by animus toward plaintiff's disability, therefore the "because of" language more accurately reflects plaintiff's burden.

sufficient to establish, as a prima facie matter, that she was denied tenure
solely because of her disabilities.[15]

*See also Morris v. City of New York*, 153 F. Supp. 2d 494, 500 (S.D.N.Y. 2001)(Chin, J.)("To

satisfy the fourth element, the causal relationship between the disability and the adverse

employment decision need not be direct, and a plaintiff may establish that the decision was

motivated by his disability by demonstrating that "the disability caused conduct that, in turn,

motivated" the employer's decision.")

Plaintiff's evidence in this case is even stronger than that in *Brokowsi*.  Not only did

plaintiff submit to defendant letters from his psychiatrist that unequivocally stated that

plaintiff's lateness was an unavoidable consequence of the medication he was taking to

control his disability, but defendant's own documents reveal that they were fully aware of this

fact.  O'Neill Dec. Ex. F, G, H.  Defendant made no effort to accommodate plaintiff's

disability or even engage in the interactive process for that matter.  Lemons Dep. 73-75, 78-

79.  To the contrary, by telling plaintiff to "change his medications", defendant in effect

demanded that plaintiff's disability accommodate defendant's work rules. O'Neill Dec. Ex. G.

Finally, state law is very plain on this point.  To establish a prima facie case of

disability discrimination, plaintiff need show only that he "suffers from a disability and the

disability caused the behavior for which the individual was terminated."  *McEniry v. Landi*,

84 N.Y.2d 554, 558 (1994).

---

[15]     *Borkowski* was decided under the Rehabilitation Act, which requires a "but for" analysis on the issue of
causation.  Thus, the Court need not decide whether the Supreme Court's decision in *Gross v. FBL Fin. Services,
Inc.*, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) is applicable to ADA claims.  Not only is plaintiff's evidence
sufficient to satisfy the "but for" requirement of the Rehabilitation Act and *Gross*, but under plaintiff's local law
claims, he need satisfy only the "motivating factor" standard currently applied to ADA claims in this circuit.  See
*Weiss v. JPMorgan Chase & Co.*, 06 CIV. 4402 (DLC), 2010 WL 114248 (S.D.N.Y. Jan. 13, 2010)

### III.      Plaintiff Need Not Demonstrate Pretext.

Defendant argues that, even if plaintiff has established a prima facie case of disability discrimination, defendant's discipline of plaintiff for lateness was for legitimate business reasons and plaintiff cannot demonstrate that those reasons were a pretext for discrimination. Def's Mem., p. 9.  In making this argument, defendant assumes (without discussion or citation to authority) that the second and third parts of the *McDonnell Douglas* paradigm for proving intentional discrimination by circumstantial evidence should be grafted, without modification, onto this case.  The problem with that approach, however, is that it is illogical.  Plaintiff does not allege that he was intentionally targeted for attendance discipline because he is disabled. Rather, plaintiff alleges that his disability caused his attendance problems, and that defendant, by disciplining him without consideration of the possibility of a reasonable accommodation, discriminated against him. *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir. 1995). Thus, the focus should be on the issue of accommodation, not pretext.

Defendant anticipates this argument on page 10 of its memorandum.  ("Plaintiff may argue in opposition to this motion that had his request for a later flex time been granted, he would not have been disciplined for lateness.")  Defendant then gives two reasons why such an argument would fail:  first, that plaintiff did not request a later flex time until after the discipline process had been invoked against him, and second, that the later flex time would not have eliminated his lateness problem.

The first argument fails as a matter of law and fact and will be discussed here.  The second argument, which simply raises questions of fact, is the same argument made by defendant with respect to plaintiff's reasonable accommodation claim.  Accordingly, plaintiff

sees no reason to respond to that argument twice, and he will address it in the section of this memorandum dealing with the reasonable accommodation claim.

Defendant is simply wrong that plaintiff did not request a later start time until after the disciplines had been initiated.  Plaintiff raised the matter with his supervisor any number of occasions, and his EEOC charge, filed before any of the disciplinary proceedings in question, complains that the defendant had failed to accommodate his disability by giving him a later start time.  McMillan Dec. ¶ 4, O'Connor Dec. Ex. P.

Furthermore, defendant was well aware of plaintiff's disability and the fact that plaintiff's lateness was caused by it.  Plaintiff's supervisor testified as follows:

> Q.      Do you know why he's late every day?
>
> A.      Yes.  We have talked about it frequently.  He takes psychographic [sic] medication and he tells me in the mornings he's very, very drowsy and it impedes him getting dressed for work and getting out in the morning to get to work on time.
>
> Q.      When did he first talk to you about this?
>
> A.      Ever since ever since he started working with me.

Thornton Dep. 60-61.

Thornton has supervised plaintiff since about 2000.  Plaintiff Dep. 34.

Thus, even if plaintiff did not specifically request an accommodation (which he did), defendant was under a duty to offer him one, or at least to engage in the interactive process to determine whether an accommodation was feasible.  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)("We therefore hold that an employer has a duty reasonably to

accommodate an employee's disability if the disability is obvious-which is to say, if the

employer knew or reasonably should have known that the employee was disabled.")

### IV.    Defendant Discriminated Against Plaintiff By Failing To Provide Reasonable Accommodations.

In addition to discriminating against plaintiff by docking his pay and disciplining him

for lateness caused by his disability, defendant has discriminated against plaintiff (and

continues to do so) by failing to provide him with reasonable accommodations for his

disabilities.  A prima facie case for failure to provide reasonable accommodations is

established by showing (1) plaintiff is disabled within the meaning of the ADA, (2) the

employer covered by the ADA had notice of his disability, (3) that plaintiff could perform the

essential functions of his job with reasonable accommodation, and (4) that the employer has

refused to make such accommodations.  *Stone v. City of Mount Vernon*, 118 F.3d 92, 96 (2d

Cir. 1997)

Once plaintiff makes the prima facie case, defendant can defeat the claim only by

showing that the reasonable accommodation requested by plaintiff would cause defendant

undue hardship.  *Id.*  The burden of proving undue hardship is on the defendant employer.  *Id.*

In this case, defendant does not argue that the accommodations requested by plaintiff

would result in undue hardship.  Instead, defendant argues that (a) it has provided all of the

accommodations requested except the request for a later flex time and (b) plaintiff's request

for a later flex time need not be provided because it would be futile.  As discussed below,

these are strictly factual issues, and there are triable issues of material fact concerning these

contentions that preclude summary judgment.

As a preliminary matter, defendant's argument assumes that the only accommodation requests at issue are those made in his formal, written requests for accommodations dated March 10, 2010 and April 22, 2010.  Plaintiff disputes that these are the only requests that were made.  Specifically, plaintiff contends that he made numerous verbal requests for these accommodations during the relevant time frame.  McMillan Dec. ¶ 4.  However, since defendant does not argue that the timing of these requests has any legal significance[16], plaintiff need not address the issue, except to note that he does not concede the point and reserves all available claims and arguments based on his verbal requests for accommodations.

**Plaintiff's Request For A Reduced Case Load Has Not Been Granted.**

Defendant contends that it has provided plaintiff a reduced case load.  Defendant's evidence consists of a memo from the Director of plaintiff's work group, noting that plaintiff's case load is below the average case load in his unit, and plaintiff's deposition testimony in which he noted that his caseload went down after he made his request for an accommodation.  Plaintiff Dep. 43:24-45:11.  Although this evidence seems rather compelling at first blush, upon examination and consideration of conflicting evidence, it is clear that there are questions of fact that preclude summary judgment.

Plaintiff's deposition testimony is in fact equivocal.  Although he testified that "she did reduce my case load," (Plaintiff Dep. 44:1-19), he then makes it clear that that statement was merely his surmisal:

---

[16]     For example, since the written requests were made well after plaintiff's EEOC charge was filed, defendant could have made the argument that plaintiff has not satisfied the condition precedent to asserting claims under the ADA based on those requests.  Since defendant has not raised the issue, and since it is a waivable defense, plaintiff need not address it.

"They didn't tell me they were reducing it at the time, I just looked at the cases I had from month to month, and it seemed a lot less than what I had been having, so it was just a surprise to me." *Id*, 45:l-5.

In other words, there really is no foundation for plaintiff's testimony that "she did reduce my case load." That was his conclusion based on the fact that he "seemed" to have fewer cases than previously. Plaintiff does not know why his case load was reduced, and defendant has not shed any light on the issue.

According to plaintiff's supervisor, plaintiff's caseload was reduced from about 200 cases to 120 cases in about 2007, well before he made the request for an accommodation. Thornton Dep. 48-51.

The memo from plaintiff's unit manager to Lemons, the EEO deputy director, is also ambiguous. It states that plaintiff *already* had a reduced case load. O'Connor Dec. Ex. I. Thus, her memo does not establish that plaintiff's request for an accommodation was granted. In fact, it implies just the opposite – that the request was not granted because, in the view of the manager, plaintiff already had a reduced case load and did not need the accommodation.

Furthermore, defendant's own documents reflect that plaintiff's caseload was not reduced, and the fluctuations were the result of normal changes in the work load. O'Neill Dec. Ex. J. At the present time he has 200 cases, which, according to defendant's evidence, is a full caseload. McMillan Dec. ¶ 3. It is self evident, therefore, that if plaintiff has a full caseload, his request for a reduced caseload has not been given to him.

**Plaintiff's Request For Voice Activated Software Has Not Been Granted.**

Defendant contends that plaintiff's request for voice activated software has been granted, because the software has been installed in his computer and because plaintiff has

been provided with a microphone.  The problem is that the software does not work. Plaintiff Dep. 12:9-15.

It should be readily obvious that, implicit in plaintiff's request for voice activated software is that the software function and that plaintiff be trained in its use.  After all, the reason for the request is that it would permit plaintiff, who has only one arm, to work more efficiently with his computer.  Obviously, that result cannot come about if the software does not function or if plaintiff is not trained in its use.

Defendant has submitted the declaration of Verna Blake, who has the title of Computer Specialist Software II.  O'Connor Dec. Ex. J.  According to Ms. Blake, the the voice recognition software installed on plaintiff's computer cannot work with Long Term Care Web, an application used by plaintiff, because Long Term Care Web "is an event driven application dependent on data from drop-down menus, radio and text boxes and command menus" and that "these events are triggered by mouse clicks and keyboard data entry."  *Id.* Ms. Blake goes on to aver that "current technology does not allow for events to be triggered by voice commands."  *Id.*

The problem with the above statements in Ms. Blake's declaration is that they are not made on personal knowledge.  Rule 56 is quite specific.  A supporting affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Ms. Blake's statements regarding Long Term Care Web are based on "information received from the HRA Development Team," i.e., it is rank hearsay.  Furthermore, Ms. Blake's declaration fails to show that she is competent to make wholesale statements about the state of the

"current technology" of voice commands.  The same observation applies to her equally conclusory statement concerning fill in forms made in paragraph five of her declaration.[17]

Moreover, Ms. Blake is simply wrong.  Promotional literature put out by Nuance, as well as the help pages from Naturally Speaking, as well as the personal experience of plaintiff's attorney, show that *all* functions of the computer can be controlled by voice activated commands, including mouse clicks, drop down menus, radio buttons, etc.  O'Neill Dec., ¶¶ 17-22.

The software installed on plaintiff's computer does not function, and plaintiff has not been trained in its use.  Accordingly, defendant has not provided this reasonable accommodation to the plaintiff.

### Plaintiff's Request For A Personal Printer Was Untimely Granted.

Plaintiff acknowledges that his request for a personal printer has been granted as of December 13, 2010 – nine months after plaintiff made a formal request and six months after plaintiff was forced to start a federal lawsuit.  Defendant has not explained why it took so long to consider such a simple request and how or why granting the accommodation in the middle of litigation absolves defendant of liability for failing to grant the request in a timely manner.

### Defendant's Refusal to Grant Plaintiff A Later Start Time Is Unreasonable.

Defendant argues that it cannot be held liable for failing to grant plaintiff's requested accommodation of a later flex starting time, because there was no likelihood that the

---

[17]     It should go without saying that Ms. Blake's statements in paragraph 6 of her declaration about her alleged conversation with employees of Nuance Software Company are inadmissible hearsay as well.

accommodation would be successful.  Def's Mem., p. 13.  As a result, reasons defendant, it

has no liability for its admitted failure to engage in the interactive process with plaintiff.

*McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 101  (2d Cir. 2009).  As

cautioned by the Court in *McBride*, however, "[i]t is certainly true that an employer, by

failing to engage in a sufficient interactive process, risks not discovering a means by which an

employee's disability could have been accommodated and thereby increases the chance that it

will be found to have violated the ADA."  *Id*.

     That is exactly the instant case.  Assuming, without conceding, that plaintiff's request

for an 11:00 a.m. start time would not be a successful accommodation, it does not end the

inquiry.  The issue is not exclusively whether plaintiff's specifically requested

accommodation could be granted, but whether *any* reasonable accommodation could have

been offered to plaintiff that would have permitted him to perform the essential functions of

his job.  Because the record unequivocally establishes that such an accommodation could

have been provided to plaintiff, summary judgment must be denied to defendant.  Indeed,

summary judgment should be granted to the plaintiff, because defendant has not, and can not,

offer any reason for failing to provide a reasonable accommodation to the plaintiff.

     Initially, plaintiff must correct a misstatement made by the defendant on page 13 of its

memorandum.  Defendant wrote that "it is well-settled that arriving to work at the designated

time is an essential function of plaintiff's position."  That is simply not true.  Plaintiff's unit

works a "flex time" schedule.  As explained above, this means that there is no "designated"

starting time.  There are a range of times that employees can elect to arrive at work, and

employees can arrive at work at different times every day, as long as they arrive within the

window of their chosen flex time and as long as they stay late enough to put in their required

hours.  Thornton Dep. 116-121.  That window is typically an hour long.  By requesting a later start time, plaintiff is essentially requesting a larger window, and defendant has not argued, much less proven as a matter of law, that it is an essential function of plaintiff's job that he arrive at a given hour, or before a given hour, or not later than a given hour, on any particular day.

The significant flexibility inherent in plaintiff's work schedule is underscored by the fact that, for years, plaintiff's late arrival to work was treated by defendant as an "approved" lateness.  Plaintiff Dep. 144-148.  As discussed above, an employee could be paid for an approved lateness by using banked time, and whether paid or not, an approved absence would not result in discipline to the employee.  In plaintiff's case, the arbitrary reversal in defendant's practice with respect to approving plaintiff's latenesses has led to the discipline at issue in this lawsuit.  Had defendant engaged in the interactive process with plaintiff, it could have agreed, as an accommodation, that plaintiff's latenesses, be approved.  Defendant has not shown what "undue burden" it would suffer by approving plaintiff's latenesses nor has it proffered any evidence as to why it reversed its earlier practice and began to uniformly disapproved plaintiff's absences.

The most useful accommodation to plaintiff would be to permit him to work until 7:00 p.m., shifting the focus of the accommodation from the time he arrives to whether he completes a full 35 hours of work each week.[18]  That accommodation would, with application of defendant's other time and attendance policies, permit the plaintiff to work his full seven hours per day and avoid any lateness disciplines.  O'Neill Dec. ¶¶ 23-28.

---

[18]     Plaintiff's request for a later flex time, i.e., up to 11:00 a.m., necessarily carried with it the request to be permitted to work until 7:00 p.m.  Thus, the suggested accommodation is little more than a variation on plaintiff's request and it is a patently obvious solution that would have presented itself had defendant actually engaged in the interactive process with plaintiff,

Since plaintiff typically arrives to work before 11:00 a.m., if he were permitted to work until 7:00 p.m., he could bank time to be used on those occasions that he arrived after 11:00 a.m.  Analysis of plaintiff's time records shows that this would be completely effective. O'Neill Dec. ¶¶ 23-28.  For example, in January, 2008, if plaintiff had worked until 7:00 p.m. every day, he would have worked an average of 8 hours and 8 minutes per day.  Not only would plaintiff had worked 100 percent of his required time, but he would have banked an additional 160 minutes of time that could be applied against future deficiencies.[19]  It should be noted that plaintiff arrived to work past 11:00 a.m. on ten occasions in January, 2008, which is about twice his monthly average.  O'Neill Dec. ¶ 23-28.  Even so, he would have been able to have exceeded all his required work hours if he had been permitted to work until 7:00 p.m.

Finally, in the unlikely event that plaintiff could not achieve his required hours under the foregoing scenario, defendant permits employees to work through lunch, or shorter lunch periods, in order to make up time.  Vinson Dep. 53-56.

Thus, it is beyond dispute that plaintiff could work his required hours if he were permitted to work until 7:00 p.m.

Defendant's stated reason for not giving plaintiff an accommodation with respect to a later start time has consistently been that there was no supervision available after 6:00 p.m.  Although defendant does not rely on that reason in its motion, it is appropriate to discuss it briefly, since the record is replete with references to it.  Defendant has never explained why plaintiff cannot work without a supervisor present, nor has it presented any evidence that to do so would impose an undue hardship upon the defendant.  Furthermore, defendant's time

---

[19]     This is because plaintiff would have worked an average of 8 extra minutes per day, and he worked 20 days in January, 2008.

records show that plaintiff has frequently worked later than 7:00 p.m., calling into question

the factual accuracy of the objection in the first place.  Obviously, since defendant has not

relied on this rationale in its motion, plaintiff has no burden to produce any evidence with

respect to it, and it is sufficient to note that the objection is not supported by any admissible

evidence, nor does it satisfy defendant's burden to prove an "undue hardship."

## Conclusion

For the reasons stated above, defendant's motion should be denied in its entirety.

Dated: New York, New York
           February 4, 2011


                              MICHAEL G. O'NEILL
                              (MO3957)


                              _____
                              Attorney for Plaintiff
                              30 Vesey Street, Third Floor
                              New York, New York 10007
                              (212) 581-0990

31